UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

| | | |
|---|---|---|
| JANE DOE | ) | |
| | ) | |
| | ) | |
| PLAINTIFF | ) | CASE NO.  3:23CV-314-DJH |
| | ) | |
| v. | ) | |
| | ) | *ELECTRONICALLY FILED* |
| BRYAN WILSON, Individual Capacity | ) | |
| FCI Elkton | ) | |
| 8730 Scroggs Road | ) | |
| Lisbon, OH 44432 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| STEVEN CONRAD, Official Capacity | ) | |
| | ) | |
| and | ) | |
| | ) | |
| ROBERT SCHROEDER, Official Capacity | ) | |
| | ) | |
| and | ) | |
| | ) | |
| WILLIAM HIBBS, Official Capacity | ) | |
| | ) | |
| | ) | |
| DEFENDANTS | ) | |

## **COMPLAINT**

Comes the Plaintiff, Jane Doe, and hereby submits the following in support of her Complaint against the Defendants Bryan Wilson, Steve Conrad, Robert Schroder, and William Hibbs:

## I.      **PRELIMINARY STATEMENT**

1.      Former Louisville Metro Police Officer (hereinafter referred to as "LMPD") officer Bryan Wilson is a predator.  For years, Wilson used his position as an LMPD officer to further his

sexual deviance and predatory acts. For years, LMPD command staff knew that he was preying upon those whom he was sworn to protect and that he used his position and LMPD equipment and resources to further his predatory schemes and actions. He preyed upon confidential informants, marginalized members of the community, and preyed upon women he stalked online using LMPD resources.

2.    In June of 2022, Wilson pled guilty to multiple counts of cyberstalking, in addition to other crimes, in the United States District Court for the Western District of Kentucky. The Plaintiff, Jane Doe, is one of Wilson's victims. She was emotionally devastated and contemplated suicide after Wilson hacked into her online accounts, stole intimate, personal, private video footage of her, and, using information he obtained through his access to LMPD's databases, taunted, harassed, and threatened her for months in attempt to obtain additional nude photographs.

3.    This is an action for invasion of privacy, violations of the Stored Communications Act, and intentional infliction of emotional distress arising out of the incidents that occurred in July and August 2020, in Jefferson County, Kentucky. The Plaintiff seeks compensatory and punitive damages associated with Wilson's conduct, both from Wilson and from those within LMPD who knew of Wilson's predatory behavior and chose to ignore the same.

## II.    PARTIES, JURISDICTION & VENUE

4.    The Plaintiff, Jane Doe, is a resident of Louisville, Jefferson County, Kentucky.

5.    Upon information and belief, Defendant Bryan Wilson is a resident of Shepherdsville, Kentucky, who is currently incarcerated at FCI Elkton, in Lisbon, Ohio.

6.    Upon information and belief, Defendants Steve Conrad, Robert Schroder, William Hibbs, and Unknown Defendants were, at all times relevant herein, command staff within the Louisville Metro Police Department who were responsible for making policy, imposing discipline, and assuring that LMPD officers, including Wilson, were properly supervised. They are sued in

2

their official capacities. Each are alleged to have committed *Monell* violations by ratifying customs and practices of sexual abuse upon citizens by officers, concealing sexual abuse, failing to investigate credible complaints of sexual abuse, and failing to specifically take proper action against Wilson upon receiving notice of his sexual abuse and predatory actions.

7.      Jurisdiction and venue are proper due to the claims asserted herein, the location of the incident, the damages claimed, and the matters in controversy.

### III.      FACTUAL BACKGROUND

*LMPD's history of protecting its own sexual predators*

8.      LMPD maintains a disturbing internal culture where pervasive patterns of sexual misconduct and predatory behaviors of officers have been repeatedly excused, ignored, concealed, and fostered.

9.      In 2013, an LMPD officer reported allegations to command staff that LMPD Officer Kenny Betts was inappropriately texting an underage teenager who was a member of the LMPD Explorer Program.

10.      Betts and fellow LMPD officers Brandon Wood and Bradley Schuhmann used their positions as LMPD officers and mentors in the Explorer program to groom, sext, sexually assault, and rape numerous underage teens who were cadets in the Explorer program.

11.      In 2014, an internal investigation into Betts conduct was closed after LMPD Chief Steve Conrad allowed Betts to resign.

12.      Evidence emerged in 2017, that LMPD and the Louisville Mayor's Office had known about sexual abuse in the Explorer program since 2013 but took no appropriate corrective actions.

13.      Further, information was later discovered that, at the time Betts was hired as an LMPD police officer, Chief Steve Conrad was aware of sexual assault allegations against Betts

that occurred when he was an Explorer Scout.

14.     LMPD then hid more than 738,000 records related to the Explorer investigation.

15.     Betts, Woods, and Schuhmann were eventually sentenced on Federal charges related to their sex crimes.

16.     Between 2015, and 2017, LMPD officer Pablo Cano sexually assaulted at least five women.

17.     He was only placed on administrative leave after two years of his predatory and assaultive conduct and was allowed to resign in 2017, more than a year after the first report of sexual assault was made against him by a victim.

18.     The LMPD personnel file of former officer Brett Hankison, who is currently under federal indictment related to his excessive use of force during the execution of the warrant on Breonna Taylor's home, reflects he received more than 50 internal incident reports surrounding his conduct, but received no discipline whatsoever.

19.     At least three women have come forth with sexual assault and/or rape allegations against Hankison arising from his well-known predatory conduct while in LMPD uniform, working off-duty officer at local bars.

20.     The internal Hankison investigation into sexual harassment of a female confidential informant not only cleared him, but also vilified the victim from bringing the report.

21.     In 2018, LMPD Officer Steven Pond was reported for sending unwanted sexually explicit messages to four female coworkers.

22.     Defendant Conrad initially concluded that Pond's conduct warranted termination.

23.     Conrad changed his mind and permitted Pond to retain his job.

24.     In September of 2019, a Jefferson County jury awarded a female LMPD Lieutenant

$1.2 million dollars in a sexual harassment lawsuit filed against LMPD following the department's failure to implement prompt and appropriate corrective action after she reported to command staff that Lt. Rob Shadle sent her unwelcomed text message containing a photograph of his penis.

25.    LMPD command staff attempted to dissuade this Lieutenant from filing an official report of Shadle's misconduct.

26.    Shadle retained his position.

27.    On several occasions leading up to 2020, LMPD Detective Brian Bailey was reported to have forced confidential informants to perform sex acts on him under threat of criminal prosecution.

28.    After Bailey declined to speak to PIU investigators, LMPD determined that the allegations were "unfounded" and closed the case, without even examining his department-issued cell phone.

29.    LMPD did not initiate a Professional Standards Unit (hereinafter referred to as "PSU") investigation to determine whether Bailey violated department policies and procedures.

30.    LMPD's tolerance of sexual misconduct runs rampant within LMPD.

31.    LMPD's entire homicide division fell under scrutiny following reports that members engage in sexual activity with each other while on duty.

32.    In fact, former LMPD Chief Erika Shields blasted the entire department, confirming that she had to devote manpower to "running blacklights" throughout the division to determine whether there was evidence of semen in supervisors' offices – to see if the officers were having sex in the office.

33.    Shields further confirmed that certain units were notably unproductive because of rampant sexual affairs.

34.    In 2023, the Department of Justice released reports of an investigation into LMPD's patterns and practices.

35.    One of the DOJ's conclusions was that "LMPD does not adequately investigate officers accused of sexual misconduct and domestic violence."

36.    Specifically, the DOJ report stated that, "(w)e found numerous instances where LMPD did not open administrative investigations to correspond to criminal investigations into reports of sexual misconduct and domestic violence by officers."

37.    The DOJ confirmed that even when administrative investigations occurred, they routinely did not address important allegations, such as reports that officers had tried to intimidate or retaliate against women for reporting sexual harassment or domestic violence.

38.    In one case noted by the DOJ, an LMPD officer's former girlfriend obtained an emergency protection order against him.

39.    In her affidavit for the order, she reported that the officer had threatened her with violence during their relationship and had tracked her activity, possibly with law enforcement technology.

40.    She also reported that the officer had engaged in some of this behavior after investigators and his supervisor had told him to stop contacting her.

41.    LMPD's criminal investigators closed the case after the protection order was dismissed 12 days later.

42.    LMPD declined to conduct an administrative investigation into the officer's conduct.

43.    LMPD routinely failed to gather or otherwise disregarded evidence, such as testimony from outcry witnesses (the people who first heard about the sexual misconduct and

domestic violence), other potential victims or witnesses, other related misconduct, or text or phone messages that may be stored on officers' and victims' phones, all of which could corroborate women's accounts of sexual misconduct by the officers.

44.     In one investigation, a woman reported that a narcotics detective was having sex with her daughter, whom he had charged with drug possession.

45.     The woman also provided investigators with the names of two other women the detective was similarly exploiting.

46.     When the woman's daughter told the investigator that the detective had texted her photos of his genitalia and leveraged the charges over her to coerce her into sending him photos of herself, she said: "if he's doing it to me, he's doing it to somebody else."

47.     The investigator lost track of the victim and closed the investigation as "appears unfounded" without then undertaking any additional investigation such as trying to locate the detectives' other victims.

48.     Five years later, three more women came forward with similar accusations against the detective.

49.     This time, an administrative investigator reached the same conclusion as the detective's first known victim: that he had "target[ed] drug addicts" and "low income individuals, mostly living in the Portland neighborhood" for sexual coercion.

50.     The detective resigned before the completion of the administrative investigation into the reports by the four women.

LMPD's pattern of deficient investigations into officer misconduct

51.     At all times relevant herein, there was an internal failure at LMPD with the process of investigating allegations of officer misconduct.

52.    The DOJ investigation confirmed that the investigations were seldom objective, were not timely completed, and failed to result in meaningful consequences, thereby resulting in officers engaging in repeated violations.

53.    For starters, LMPD did not consistently even investigate potential misconduct.

54.    LMPD made the process overly difficult for complaints to be filed and opened.

55.    Patrol divisions did not follow a standard practice for receiving complaints of officer misconduct from civilians.

56.    Some supervisors screened out complaints from ever being submitted, including by persuading civilians not to file complaints.

57.    LMPD has threatened and retaliated against civilian complainants.

58.    In multiple cases, Chief Conrad initiated investigations only after incidents received media attention, long after the civilians involved had objected to their treatment.

59.    Investigators often asked leading questions, priming officers to give certain answers.

60.    Investigators routinely failed to run down leads, including neglecting to interview potential witnesses.

61.    When administrative investigations uncovered evidence of other policy violations beyond those alleged in the initial complaint, investigators failed to look into those additional violations.

62.    Investigators routinely drew inferences in favor of officers and against civilians that were not supported by the evidence, seeking to justify officers' actions.

63.    Supervisors also routinely failed to detect and address misconduct.

64.    The department failed to address repeated violations with progressively more

serious consequences.

65.    When officers violated policy even after counseling, supervisors continued to counsel them instead of recommending discipline.

66.    LMPD's administrative investigations were untimely, routinely taking years to complete.

67.    When Chief Shields arrived in 2021, there were open misconduct cases from 2017.

68.    These delays undermined accountability and failed to address credible complaints of serious misconduct.

69.    And even when investigators concluded that officers violated LMPD policy, LMPD routinely failed to impose meaningful consequences.

70.    It was common for an internal affairs investigator to document strong evidence of misconduct, only for LMPD leadership to deviate from the investigator's recommended findings and not explain the departures from them.

71.    Even when the chief determined that an officer committed misconduct, he regularly imposed minimal discipline.

72.    LMPD routinely allowed officers to resign, rather than terminating them, even when officers had pleaded guilty to crimes, expressed explicit racial bias, or faced multiple civil rights lawsuits at the time of their resignation.

73.    LMPD's failure to terminate officers in these cases signaled to officers that they can escape disciplinary consequences for even the most serious violations.

74.    LMPD's deficient systems resulted in officers violating the law and LMPD policy again and again over the course of years.

75.    In some cases, officers escaped meaningful consequences and remained on the

force.

76.    In other cases, misconduct escalated until officers were criminally charged.

77.    In the past five years, LMPD officers have pleaded guilty to a range of crimes, including sexual abuse or misconduct, federal civil rights violations, assault, excessive force, theft, falsely inflating overtime, and working private security jobs while clocked in for patrol duty.

78.    Repeated misconduct is further evidence that internal accountability systems were deficient, contributing to LMPD's systemic legal violations and harming of community members.

*LMPD's tolerance and ratification of rogue Ninth Mobile Division*

79.    LMPD's tolerance and willful ignorance of officer misconduct was particularly prevalent within the department's Ninth Mobile Division.

80.    The Ninth Mobile Division was created in 2015 as a rebranded version of the former VIPER unit.

81.    The VIPER Unit had been led by a lieutenant who had previously been disciplined for racist comments.

82.    The lieutenant asked a Latino officer "why he was Mexican and could not speak Spanish," said "all Asians can do are play in Godzilla movies," called an officer a "chink," and told him "that's why we killed all your people with the bomb back in Japan."

83.    In 2014, the lieutenant resigned during an internal investigation, which found that VIPER officers displayed pornographic material throughout the office and that the lieutenant regularly exposed himself to other officers "as a joke."

84.    When the Ninth Mobile Division formed, most of the initial members had previously been in this VIPER Unit.

85.    For four years, the Ninth Mobile Division remained under scrutiny for its unconstitutional tactics and unchecked policing.

86.    In 2020, LMPD officials identified that more than 20 Ninth Mobile members were not completing the required documentation on traffic stops…and that they had not been doing so for years.

87.    These violators were only given a written reprimand.

88.    In 2018 and 2019, ninth mobile members, including the Defendant Bryan Wilson, were driving around in unmarked cars, throwing slushie drinks at residents.

89.    Some of these incidents were recorded on video and circulated within the department.

90.    LMPD never opened an investigation into the misconduct.

*Bryan Wilson's history of red flags and misconduct*

91.    Bryan Wilson became a sworn member of LMPD in 2012.

92.    In 2014, Wilson engaged in a high speed police pursuit, which resulted in the pursued vehicle crashing and Wilson firing shots at the individuals in the vehicle. LMPD investigators concluded that shots were fired at Wilson first.

93.    The investigative file into the shooting contains no evidence (not even photos of shell casings) that any shots were ever fired at Wilson at all, let alone prior to him shooting.

94.    Over the next several years, Wilson was involved in situations which included excessive force and inappropriate conduct with citizens.

95.    He joined the Ninth Mobile Division in 2016.

96.    His best friend on the Department, with whom he routinely rode in tandem, was Kelly Hannah Goodlett (in 2022, Goodlett pled guilty to federal crimes related to the death of Breonna Taylor).

97.    Wilson was involved in pervasive, unwanted sexual conduct with citizens throughout his time in Ninth Mobile.

98.    Wilson used multiple aliases online, including but not limited to "joejones6169" and "tlong4224," to message citizens and begin conversations that were sexual in nature.

99.    Wilson identified himself as a police officer in these communications.

100.    Wilson routinely photographed his exposed penis while in uniform or otherwise on duty and sent out the photos online. See Exhibit A.

101.    In 2017, Defendant Hibbs was provided with information from a Sergeant who indicated concerns with Wilson's conduct.

102.    Specifically, it was a text message from Wilson to a registered confidential informant which stated, "When are you gonna let me hit it?"

103.    Wilson then advised the confidential informant that she needed to be careful who she was dealing with if she was back to selling dope.

104.    Hibbs did not discipline Wilson for the incident.

105.    Wilson's online sexual activity persisted over the next two years.

106.    In 2019, LMPD command learned that Wilson was having inappropriate sexual contact with Confidential Informants and Criminal Defendants in on-going criminal cases.

107.    Furthermore, LMPD command learned of Wilson's online profile and was able to identify postings made by him.

108.    A search by LMPD investigators of Wilson's activity on Reddit identified at least 130 pornographic threads in which he participated.

109.    His posts included, but were not limited to, the following:

Tlong4224  1 point  ·  6 months ago

## Pretty. Needs filled with a nice cock

Reply  Share  •••

---

⬆
**1**
⬇

🔘 **r/RandomActsOfBlowJob**  Posted by u/Tlong4224 6 months ago

# #Louisville, KY NSA blowjob [■4f] or possibly [■4m]

Removed (4tag split): 'or'  [nsfw]

🖼 3 Comments  ↗ Share  🔖 Save  •••

---

⬆
**2**
⬇

🔘 **r/Random_Acts_Of_Sex**  Posted by u/Tlong4224 6 months ago

# 30 (■4f) Louisville, KY - NSA blowjob and/or more  [nsfw]

🖼 Comment  ↗ Share  🔖 Save  •••

 Tlong4224 commented on Overdue for a wax and a fucking   i.redd.it/vzzvb6... ☑ | nsfw |   ı
by u/throwaway12262017

Tlong4224  1 point  ·  6 months ago
You're overdue for a bush hog! I would have to pass on that pussy, sorry!

Reply  Share  •••

Tlong4224  1 point  ·  6 months ago
You do realize that Chief Conrad is undoubtably the worst person to lead our police department...right? Conrad is appointed to this position but none other than Mayor Fischer. Conrad is a political nut case whose cost the tax payers millions of dollars in law suit settlements that are direct results of his poor decisions. Crime is rampant and is also a direct reflection of his leadership. Scenario: if your child is being disrespectful or disobedient and when you attempt to correct them they walk out of the room and slam the door in your face, what is the appropriate course of action? Yes, exactly... you chase them down and deal with them. Now apply this concept to criminals on the street. If metro police see your stolen car driving down broadway loaded down with gangbangers who decide not to yield to the red and blue lights, what is the appropriate course of action? Yes, exactly... the police should intervene to recover your stolen property and place those deserving in jail. That is what a real police department would do for their citizens, but not a department under chief Conrad! YOU SHALL TERMINATE!

Tlong4224  1 point  ·  7 months ago
Very hot! Your tits look delicious, your pussy appears to be shaved and by the looks of your waist, you clearly take care of yourself. I'm going out in the limb, but I'm thinking your brunette and very pretty in the face. 8.5/10 and I'd love to throw it to you!

Reply  Share  •••

Tlong4224  -1 points  ·  7 months ago
Hun, I would fuck you retarded! Having 3 kiddos, you've taken very good care of yourself; you look amazing! If you ever travel to the east coast, hit the wife and I up

Reply  Share  •••

## Tlong4224 Profile



**Tlong4224**

**Profile views:** 112
**Fanbase:** 3

**About Me**
I'm in my early 30s, ▮▮▮▮ attractive and in shape. I'm a cop, very dominant, Open minded and very outgoing. I'm a thrill seeker and the ▮▮▮ equivalent of a "slut". I'm sort of an exhibitionist as I love taking pictures of myself for others to see and I enjoy taking pictures and filming the girls I fuck. I enjoy secretly fucking married or attached women and I also love random hookups. I'm straight, but recently took head from a guy who found me on reddit, and I must say it was excellent. I would definitely take a blowjob again, but I do believe it's as far as I'd go. For that reason, I'm still straight 😊. Questions...hit me up I love to be sexual!

**Interests**
*Not yet filled in*

**Website:** *Not set*
**Signed up:** 5 months and 15 days ago
**Images viewed:** 160
**Images uploaded:** 91





Tlong4224 commented on a post in r/Slut

51    Barely 18 - more on my profile (i.redd.it)
submitted 2 months ago by sluttytacoma to r/Slut
NSFW

Tlong4224 · 1 point · submitted 9 days ago
Upvoted... how about this little sluts name!?!



Tlong4224 commented on a post in r/swallow

278    Finishing Him and Swallows Cum (gfycat.com)
submitted 4 months ago by Frank7078 to r/swallow
NSFW

omega_dawg93 · 3 points · submitted 4 months ago
source?

Tlong4224 · 2 points · submitted 3 months ago
Agree....who is this girl?



Tlong4224 commented on a post in r/NSFWGirl

25    clean an dmean-realitypornking (gfycat.com)
submitted 3 months ago by Ciara_Hot to r/NSFWGirl
NSFW

Tlong4224 · 1 point · submitted 3 months ago
Who is the young blonde?



30yo, ▮▮▮▮ Loaded dick for a open mouth. HMU if your close by and interested!

#Louisville, KY - [m4f] seeking a hungry mouth ♂♥♀ Louisville  nsfw
r/RandomActsOfBlowJob  Posted by u/Tlong4224  Louisville  9 months ago

1 Comment    Share    Save    Hide    Report

30▮▮▮▮, police officer, looking for discrete NSA fun with a girl whose got an oral fixation. More than happy to reciprocate
and or do more if interested. Hit me up on here or kik if interested! Kik: TLong4224

17



Tlong4224  1 point  ·  5 months ago

Other than the torn up pussy/huge hunk of meat hanging off it looks pretty good. I'd def wrap it up with you!

Reply  Share  ···

Tlong4224  1 point  ·  5 months ago

I can appreciate your enthusiasm, but your tits are quite disgusting. Anyone who disagrees is a creeper whose not be laid in quite a while. Do yourself a favor and start saving for a tit job and start showing your dirty little pussy, surely it looks better!

Reply  Share  ···

Slutty Rookie cop enjoying her "on duty" lunch break #1

Tlong4224   6 days ago   r/Blowjobs

---

.      On April 29, 2019, a concerned citizen filed a report with LMPD, stating:


*I believe one of your officers is behaving inappropriately online towards minors, using his position to entice people into behaving sexually with him, and potentially posting revenge porn*

*This person contacted me on reddit, and his message made me vaguely uncomfortable.*

*So I checked his post history. One of his most recent comments was him making inappropriate comments on a nude post by a 15 year old girl, which I have already reported to the relevant authorities, and reddit admins have removed.*

*I will leave links below. This man claims to be associated with the Louisville police department.*

*Also found in a quick google were videos of himself and another women, who does not appear to know she was filmed or her videos shared. I'll refrain from linking, as I'm not 100% sure a crime was committed. I am sure, however, that leaving sexual comments on child pornography is a crime, especially by someone who is supposed to be protecting and serving.*

*https://www.reddit.com/user/Tlong4224*
*General Information*
*Offense Type: Sex Crimes*
*Tipster's Contact Information*
*Tipster's Phone Number:*
*Tipster's Email Address:*
*Agency 2019/4/29 7:03 PM*

Wilson was the officer making the posts in the aforementioned complaint.

111.      LMPD did not investigate this complaint at any time between April and September

of 2019.

112.      On October 3, 2019, Lieutenant Artman made a PSU investigator aware of a PIU

case which would be assigned to him regarding Wilson posting obscene photos on social media

sites of his genitals and of him engaging in sexual acts, possibly with another member of LMPD, while representing himself as an officer with LMPD.

113.    On October 7, 2019, Wilson was placed on administrative leave by Hibbs.

114.    On the same date, the PSU investigator took Wilson's F150 to the Edison Building to be photographed and processed.

115.    There was a small amount of material which reacted to the blacklight on the steering wheel.

116.    On October 8, 2019, the PSU investigator observed that Wilson had deleted his online profiles with the sexually explicit content.

117.    During the investigation of Wilson, LMPD command also learned that he was sexually involved with a married LMPD colleague named Jessica Dickey.

118.    Wilson and Dickey made online posts of sexual videos.

119.    LMPD investigators believed that at least some of these posts occurred on duty.

120.    LMPD investigators ran a black light through Wilson's LMPD issued off duty vehicle.

121.    Evidence of potential sexual fluids were identified.

122.    LMPD investigators spoke with witnesses as part of the investigation.

123.    One witness confirmed that, following Wilson's arrest of her as part of a search warrant, he began to send her sexually suggestive text messages.

124.    Another witness confirmed that Wilson arrested her four times and would grope her during the arrests.

125.    A third witness confirmed that Wilson identified himself as an officer to her on plentyoffish.com and that he sent her sexually explicit messages.

126.    LMPD criminal investigators obtained a sworn statement from Wilson on January 8, 2020.

127.    Wilson confirmed that he and Dickey posted pornographic pictures on the internet.

128.    Wilson denied that he was the male in a post of a woman performing oral sex on a male.

129.    Dickey, when interviewed, contradicted Wilson and confirmed that it was him.

130.    Within the January 8 interview, the interviewing investigator made several comments to Wilson inferring that he intended to close the investigation.

131.    At one point, the interviewer says, "I can't shut this down and move forward until I identify who it is."

132.    The interviewer was referencing a witness.

133.    The interview called Wilson by his first name, stating "Bryan, it's – it's imperative that I find her."

134.    The interviewer then stated: "There's - there's been a history of poor sexual abuse investigations done on this police department where there's huge oversight now. There's no way that this thing is going to move without knowing who that is."

135.    Later in the interview, the interviewer stated, "I'm sure you've felt that a lot of this was unfair and bullshit that you've been off for a while."

136.    Wilson, as part of his response, stated," I wanted to believe that I was - that I was being done wrong, but at the end of the day I know that especially in light of everything that's went on in our department days before my stuff hit the, you know, hit the world and a couple years ago it's - they're not going to take any, you know, they're going to take every precaution possible due to the - the sexual re- you know, nature of it. So I understand. I don't like it but I understand."

137.    On January 12, 2020, LMPD investigators closed the criminal investigation into Wilson.

138.    On February 26, 2020, Wilson was interviewed by the PSU investigator.

139.    On March 3, 2020, the PSU investigator gave the case to a Sergeant for review.

140.    The investigator recommended that allegations against Wilson should be sustained for violations of LMPD SOP's for social media, conduct unbecoming, truthfulness, and sexual activity.

141.    The sergeant recommended that allegations against Wilson should be sustained for violations of LMPD SOP's for social media, conduct unbecoming, truthfulness, and sexual activity.

142.    On March 5, 2020, the PSU investigative findings were given to the PSU Lieutenant for review.

143.    The Lieutenant recommended that certain charges be sustained, but that social media charges not be sustained.

144.    On April 29, 2020, the Assistant Chief Lavita Chavous sent her review of the investigation to Chief Conrad.

145.    Chavous indicated her recommendations that allegations against Wilson should be sustained for violations of LMPD SOP's for social media, conduct unbecoming, truthfulness, and sexual activity.

146.    On May 4, 2020, Major Kim Burbrink submitted her recommendations to Chavous indicating that allegations against Wilson should be sustained for violations of LMPD SOP's for social media, conduct unbecoming, truthfulness, and sexual activity.

*LMPD's continued retention of Wilson; Wilson's continued use of LMPD resources to hack personal information and social media accounts for purposes of threatening, shaming, and humiliating victims*

147.    Chief Conrad did not render a finding on the investigation into Wilson, thereby allowing Wilson to retain his position, continue to be paid, and maintain access to secure LMPD databases such as Accurint.

148.    Chief Schroeder, who took over the position in June of 2020, did not render a finding on the investigation into Wilson, thereby allowing Wilson to retain his position, continue to be paid, and maintain access to secure LMPD databases such as Accurint.

149.    Accurint is a form of data-combing software used by law enforcement agencies to gather information to aid the investigation of criminal activity.

150.    Wilson continued to work on the LMPD tow lot, where he had access to multiple LMPD databases.

151.    LMPD command did not monitor Wilson's usage of the databases.

152.    Wilson used his LMPD access to Accurint to obtain information about potential hacking victims.

153.    Wilson used his LMPD access to Accurint to identify computer applications belonging to women, hacked those computer applications, and stole compromising photographs and other information.

154.    Wilson contacted women via text messages and threatened to publish stolen compromising photographs unless those women provided additional compromising photographs to him.

155.    Wilson's list of victims is unknown, but is believed to be over 20.

156.    One of those victims is the Plaintiff.

157. Beginning in July of 2020, Wilson harassed, cyber-stalked, hacked, and attempted to extort nude images from Jane Doe.

158. Wilson unlawfully obtained access into Jane Doe's private Snapchat account, seeking to obtain sexually explicit photographs and videos.

159. Wilson remained employed by LMPD when his actions against Jane Doe began.[1]

160. Wilson identified a video on Jane Doe's Snapchat.

161. Snapchat is a social media application through which users can record, store, and exchange photographs, video, messages, and other electronic communications.

162. This was a private video which was not publicly accessible.

163. Jane Doe was the sole user of her Snapchat account and her cell phone.

164. Her cell phone was password protected.

165. Her snapchat account was password protected.

166. Only Jane Doe had access to the content stored in her Snapchat account and cell phone.

167. On July 21, 2020, at 8:20 PM, Jane Doe received a text message on her cell phone sent by someone posing as a member of the Snapchat Support Team.[2]

168. The message said, "To keep Snapchat Security Policy enabled, please reply "S" to cancel please reply "N" Snapchat Support Team."

169. Jane Doe was sleepy when she read the message and replied, "S."

170. Continuing to pose as a member of the Snapchat Support Team, the individual

---

[1] Wilson resigned on August 1, 2020. Even after Wilson resigned from LMPD on August 1, 2020, LMPD did not remove his access to LMPD databases, such as Accurint.

[2] This individual posing as the Snapchat team member was Wilson. Jane Doe was not aware of this for nearly two years.

texted, "Account will be logged-out when not in use to prevent suspicious activity.  Please respond with current password to verify identity and test strength."

171.    Jane Doe replied with her Snapchat password.

172.    Wilson then used Jane Doe's password to access her Snapchat Account.

173.    Wilson extracted a private video of Jane Doe.

174.    Jane Doe had not shared the video with others and had never published the video, or any images therefrom.

175.    On July 21, 2020, at 8:55 PM, Wilson texted Jane Doe regarding the contents of the video.

176.    He then texted, "Someone posted some videos online and posted this number and asked people to respond and comment if they liked it."

177.    Jane Doe replied, "You def (*sic*) have the wrong person. I dont (*sic*) post shit like that[.]"

178.    Wilson sent Jane Doe a collage of pictures he made that included a still shot from the video footage of her.

179.    Jane Doe texted, "Can you like please delete that and leave my personal stuff alone. Like I have no clue who you are[.]"

180.    Wilson texted Jane Doe that it would go away if she would show him her "boobs."

181.    On the same day of the initial contact from Wilson to Jane Doe, Jane Doe contacted LMPD and reported that her account had been hacked and that she was being exploited.

182.    Dispatch sent patrol officers to her, who then referred her to the sex crimes unit.

183.    Jane Doe contacted the LMPD sex crimes unit the same day and left a voicemail.

184.    Nobody from the sex crimes unit responded to her.

185.    From July 21, 2020, through August 19, 2020, Wilson text messaged Jane Doe from various phone numbers.

186.    His messages were exploitative, harassing, and cruel.

187.    Wilson let her know that he was aware of her position as a public-school teacher and threatened to send the send the pictures/video to her principal, the Jefferson County Public School (hereinafter referred to as "JCPS") board, and the JCPS superintendent.

188.    Wilson repeatedly called Jane Doe a "slut," "dumb slut," "whore," "filthy whore," "bitch," "dick sucker, "cum slut," and countless other disgusting, derogatory, vulgar, abusive names.

189.    Wilson revealed that he knew where Jane Doe lived and told her that he lived about 10 miles from her.

190.    Wilson texted Jane Doe a list of her family and friends that he obtained from social media and threatened to send the photo/video footage to them, if she did not comply with his demands for nude photographs.

191.    Wilson texted the video to one of Jane Doe's friends.

192.    Jane Doe was terrified that Wilson was watching her and became deeply afraid for her safety.

193.    Jane Doe continued to attempt to the LMPD sex crimes unit during this period, calling over ten (10) times without a response.

194.    Jane Doe was concerned about the security of her job due to Wilson's threats.

195.    Jane Doe notified her principal of the personal, embarrassing, intimate details of his exploitation.

196.    Jane Doe also became increasingly concerned that her students would discover the video Wilson posted.

197.    Weeks passed without a response from LMPD.

198.    Jane Doe eventually became so emotionally drained, distraught, and depressed by the continued harassment and lack of help that she contemplated suicide.

199.    Jane Doe suffered and continued to suffer heightened anxiety and depression resulting from Wilson's actions.

200.    Wilson's actions came to an abrupt end only because of federal intervention.

201.    On September 21, 2021, Jane Doe was contacted by the Federal Bureau of Investigation (hereinafter referred to as the "FBI").

202.    The FBI informed her that she had been identified as a victim during a cyberstalking investigation.

203.    The FBI did not make Jane Doe aware of Wilson's identify.

204.    Jane Doe was unaware of Wilson's identity and remained unaware of his identity until June 22, 2022.[3]

205.    On October 19, 2022, Wilson was sentenced to 30 months imprisonment and 3 years of supervision following his release for his roles in civil rights and cyberstalking conspiracies.

---

[3] This date was the sentencing of Wilson, which was the first time Jane Doe became aware of his identity.

## V.    CLAIMS

### COUNT I –

### Invasion of the Right to Privacy/False Light (Wilson)

206.    Plaintiff adopts and reiterates each and every allegation as set forth fully herein and incorporates the same by reference.

207.    On or about July and August 2020, Bryan Wilson unreasonable intruded upon the seclusion and privacy of Jane Doe by accessing her private snapchat materials and publishing them online.

208.    Jane Doe had a legitimate expectation of privacy in the materials stored in her Snapchat account that she kept private and did not share with others, including the video and/or images accessed and retrieved by Bryan Wilson.

209.    Wilson appropriated Jane Doe's likeness without her knowledge or consent.

210.    Wilson published her likeness, photographs and/or video footage depicting her, on a public website without her knowledge or consent.

211.    Wilson's actions unreasonably placed Jane Doe in a false light before the public.

212.    Wilson's invasive and intrusive actions are conscious-shocking and highly offensive to a reasonable person.

213.    Wilson acted willfully, maliciously, outrageously, deliberately, and purposely with intent to intrude upon and publicize the private affairs of Jane Doe with intention to inflict emotional distress upon Jane Doe and to extort and coerce her into sending him nude photographs.

214.    The acts were done in reckless disregard of the probability of causing Plaintiff emotional distress, and these acts did in fact result in severe and extreme emotional distress.

215.    As a result of the Defendants' actions, Plaintiff suffered damages, including but not limited to compensatory damages for the harm to the Plaintiff's interest in privacy resulting from

the invasion, mental distress and emotional anguish secondary to privacy invasion she suffered, as well as any other damages secondary to the actions of the defendant.

216.    Further, as a direct result of the Defendants' actions, the Plaintiff is entitled to punitive damages necessary to deter the Defendants from acting callously, maliciously, wrongfully, and in gross reckless disregard in the future against the citizens of the community, to whom the Defendants owe a duty to protect from harm rather than cause harm.

## COUNT II-

**Dissemination of Materials in Violation of the Stored Communications Act (Wilson)**

217.    Plaintiff adopts and reiterates each and every allegation as set forth fully herein and incorporates the same by reference.

218.    Snapchat provides account holders electronic communication services.

219.    Bryan Wilson accessed, without authorization, Jane Doe's private Snapchat account.

220.    Wilson, without authorization, obtained, and later altered, data that transmitted through Doe's private Snapchat account and electronically stored in Doe's private Snapchat account.

221.    The data Wilson obtained was privately stored and not publicly accessible.

222.    Wilson knowingly and intentionally acted in violation of the Stored Communications Act.

223.    As a result of Defendant's violation of the SCA, Plaintiff suffered damages, including but not limited to compensatory damages for pain and suffering and mental and emotional anguish secondary to the Defendant's actions, as well as any other damages secondary to the actions of the Defendant.

224. As a direct result of the Defendant's violations of the SCA, the Plaintiff is entitled to statutory damages of no fewer than $1,000.

225. As a direct result of the Defendant's willful and intentional violations of the SCA, the Plaintiff is entitled to attorney's fees, costs, and punitive damages.

## <u>COUNT III</u> -

**Dissemination of Personally Identifying Information in violation of KRS 525.085 (Wilson)**

226. Plaintiff adopts and reiterates each and every allegation as set forth fully herein and incorporates the same by reference.

227. On or about July and August 2020, Bryan Wilson intentionally disseminated personally identifying information about Jane Doe when, with the intent to intimidate, abuse, threaten, harass, or frighten her.

228. The dissemination would cause a reasonable person to be in fear of physical injury to himself or herself, or to his or her immediate family member or household member.

229. Wilson's actions constitute a violation of KRS 525.085.

230. As a result of Wilson's actions, Jane Doe has suffered harm and continues to suffer harm.

231. That as a result of Defendant's violation of KRS 525.085, Plaintiff suffered damages, including but not limited to compensatory damages for pain and suffering and mental and emotional anguish secondary to the Defendant's actions, as well as any other damages secondary to the actions of the defendant.

232. Further, as a direct result of the Defendants' actions, the Plaintiff is entitled to punitive damages necessary to deter the Defendants from acting callously, maliciously, wrongfully, and in gross reckless disregard in the future against the citizens of the community, to

whom the Defendants owe a duty to protect from harm rather than cause harm.

## COUNT IV –

### Intentional Infliction of Emotional Distress (Wilson)

233.    Plaintiff adopts and reiterates each and every allegation as set forth fully herein and incorporates the same by reference.

234.    The acts of Wilson as described herein were done willfully, maliciously, outrageously, deliberately, and purposely with the intention to inflict emotional distress upon the Plaintiff, Jane Doe.

235.    The acts were done in reckless disregard of the probability of causing Plaintiff emotional distress, and these acts did in fact result in severe and extreme emotional distress.

236.    As a result of Wilson's actions, Plaintiff suffered damages, including but not limited to compensatory damages for pain and suffering and mental and emotional anguish, as well as any other damages secondary to the actions of the defendant.

237.    Further, as a direct result of Wilson's actions, the Plaintiff is entitled to punitive damages.

## COUNT V  -

### Negligent Supervision, Retention, and added *Monell* Claims – Common Law and *Monell* (Official Capacity Defendants)

238.    Plaintiff adopts and reiterates each and every allegation as set forth fully herein and incorporates the same by reference.

239.    At all times relevant herein, the official capacity Defendants were policymakers responsible for assuring that officers under their command conducted thorough, complete investigations of officer misconduct with dispositions that reflect proper accountability.

240.    At all times relevant herein, the official capacity Defendants acted with a deliberate,

Intentional indifference to sexual abuse and harassment by officers.

241.    The official capacity Defendants failed to exercise ordinary care in supervising Wilson, by retaining Wilson, and by maintaining Wilson's access to sensitive law enforcement databases, thereby creating a foreseeable risk of harm to the Plaintiff.

242.    These Defendants knew or should have known that Wilson was a sexual predator who used his position as a police officer to coerce, influence, and subject victims to unwanted sexual conduct.

243.    These Defendants knew or should have known that LMPD employed insufficient standards of investigating officers accused of sexual misconduct and that this failure resulted in the retention of officers, including Wilson, who continued to engage in predatory conduct.

244.    These Defendants knew or should have known that the retention of Wilson following the 2019-2020 PSU investigations into him grossly deviated from the standards of any reasonable employer, let alone law enforcement agency.

245.     These Defendants were reckless in their supervision and retention of Wilson, with such conduct amounting to bad faith and a flagrant disregard for the risks posed by the same.

246.    These Defendants knew or should have known that the sex crimes division was not responding to victim reports, thereby placing said victims at a foreseeable risk of preventable danger.

247.    These Defendants knew or should have known that LMPD Detectives, including Wilson, were utilizing Department resources to commit unconstitutional searches and seizures of individual's intellectual property and stored communications.

248.    At all times relevant herein, the official capacity defendants employed a custom and practice of tolerating officer sexual abuse.

249.    Upon information and belief, the official capacity Defendants knew or should have known about Bryan Wilson's use of law enforcement equipment and/or tools, including but not limited to Accurint, to cyberstalk women, including but not limited to the Plaintiff, Jane Doe.

250.    The official capacity Defendants knew or should have known of Wilson's propensity for sexual misconduct, including work-related sexual misconduct, and his tendency to use the internet to post sexually explicit materials.

251.    These Defendants had a duty of reasonable care owed to the Plaintiff to remove police officers from law enforcement duties and access to law enforcement technology resources when such officers pose an unreasonable risk of misconduct, violence, and harm to citizens.

252.    These Defendants breached the duty of reasonable care they owed to the community, including but not limited to the Plaintiff, Jane Doe, by retaining Wilson.

253.    These Defendants breached the duty of reasonable care they owed to the community, including but not limited to the Plaintiff, Jane Doe, by failing to supervise Wilson's computer access and activity and his Accurint access and activity.

254.    The failure of these Defendants to exercise reasonable care in its supervision and retention decisions was a proximate cause of the injuries and loss suffered by Jane Doe at the hands of Defendant Wilson.

255.    The ratification of sexual abuse by officers within LMPD was a proximate cause of the injuries and loss suffered by Jane Doe at the hands of Defendant Wilson.

256.    The custom and practice of neglecting investigative duties by LMPD was a proximate cause of the injuries and loss suffered by Jane Doe at the hands of Defendant Wilson.

257.    Plaintiff's damages include compensatory damages for mental and emotional anguish secondary to the Defendants' conduct, as well as any other damages secondary to the

actions of the Defendants.

## COUNT VI -

### Fourth Amendment Violations – (Wilson)

258.    Plaintiff adopts and reiterates each and every allegation as set forth fully herein and incorporates the same by reference.

259.    At all times relevant herein, the Defendant Wilson was acting under color of law.

260.    While acting under color of law, Wilson performed an unlawful search and seizure of the Plaintiff's social media and cell phone accounts.

261.    Wilson's unlawful search and seizure violated the Plaintiff's Fourth Amendment rights and caused her damages.

262.    Plaintiff's damages include compensatory damages for mental and emotional anguish secondary to the Defendant's conduct, as well as any other damages secondary to the actions of the Defendant.

263.    The Plaintiff is entitled to punitive damages, costs of litigation, attorney fees and all other damages recoverable for violations of 42 USC 1983.

## VI.    JURY DEMAND

264.    Plaintiff hereby demands a trial by jury of all issues so triable.

## VII.    PRAYER FOR RELIEF

A.    Compensatory damages in an amount to be shown at trial;

B.    Punitive damages in an amount to be shown at trial;

C.    Costs incurred in this action and reasonable attorneys' fees;

D.    Pre-judgment and post-judgment interest; and

E.    Such other and further relief as the Court may deem just and proper.

Respectfully Submitted,

SAM AGUIAR INJURY LAWYERS, PLLC

/s/ *Sam Aguiar*

Sam Aguiar
Sara E. Collins
1900 Plantside Drive
Louisville, KY 40299
Telephone: (502) 888-8888
Facsimile: (502) 491-3946
sam@kylawoffice.com
scollins@kylawoffice.com
*Counsel for Plaintiff, Jane Doe*